## A98A0578. KROGER COMPANY v. BROOKS.
### (500 SE2d 391)

ELDRIDGE, Judge.

On September 17, 1993, Ashley Brooks, plaintiff-appellee, was an invitee in a store of the Kroger Company ("Kroger"), defendant-appellant, where she stepped on a "mousse-like substance" on the floor, causing her to slip and fall. Plaintiff sued Kroger for its negligence in allowing such "mousse-like substance" to remain on the floor.

Plaintiff entered the store at 11:30 p.m. on Friday, September 17, 1993. In order to get to the bakery, plaintiff walked through check-out lane five, which was not open but provided access to the main store; lane five had no cashier and was closest to the entrance. Plaintiff walked right behind a friend, who had come with her. She was an arm's length behind her friend. They were there to get croissants. Neither she nor her friend saw any foreign substance on the floor prior to plaintiff's fall. On the way through lane five, plaintiff slipped and fell when she stepped on a small, flattened, white paper cup that had mousse both inside and around it. This was on the left side of the aisle. A mousse smeared streak extended several feet in length from the flattened cup. The mousse and the floor tile were the same color, so that the mousse was hidden. About a third of the ceiling lights were off, making the store dimmer than normal.

Plaintiff did not know personally how long the mousse had been on the floor prior to her fall. There was no employee at the check-out lane or on the lanes to either side, although there was a cashier at the only open check-out lane in the vicinity, lane seven, which was two lanes away. Immediately after her fall, an employee came to her aid. The employee sent for the store manager, who arrived within moments.

Mr. Barry Hastings, the store manager, testified that "earlier that day" the pastry chef put out vanilla mousse samples that he had prepared between 5:00 and 6:00 p.m. The pastry chef normally worked until 11:00 p.m. or midnight, but on that night, the pastry chef had already left by 11:00 p.m. After 11:30 p.m. when plaintiff fell, there were still mousse samples at the bakery counter.

Mr. Hastings testified that a store manager did a walk-through inspection every hour prior to 8:00 p.m. and at the end of each shift. This inspection took 15 to 20 minutes to perform. The store was swept and spot-mopped hourly from 7:00 a.m. until 7:00 to 8:00 p.m.,

when business dropped off, and thereafter, cleaning was done only on an as-needed basis. Logs or charts for cleaning and spot checks were kept daily as to the schedule, but the log was not kept for the evening.

Upon the trial of the case, at the close of plaintiff's case, the defendant moved for directed verdict, which was denied. The defendant renewed its motion for directed verdict at the close of all of the evidence, which was again denied. The jury returned a verdict for the plaintiff. On February 27, 1997, judgment was entered. Kroger filed a motion for judgment notwithstanding the verdict ("j.n.o.v."). On May 19, 1997, the trial court denied the motion. Kroger filed its notice of appeal.

Kroger enumerates two reasons that it contends the trial court erred: (1) the trial court erred in denying its motion for directed verdict; and, (2) the trial court erred in denying its motion for j.n.o.v. Both grounds will be dealt with jointly, because each arises from the same issues of law and fact and are governed by the same standards of appellate review. "A directed verdict is proper only where there is no conflict in the evidence as to any material issue and the evidence introduced with all reasonable inferences therefrom demands a particular verdict. OCGA § 9-11-50 (a); *Metromedia Steakhouses Co., L.P. v. Ray*, 219 Ga. App. 716, 717 (2) (466 SE2d 618) (1995). On appeal, the standard of review of a trial court's denial of a motion for directed verdict is the 'any evidence' standard. *F. A. F. Motor Cars v. Childers*, 181 Ga. App. 821 (1) (354 SE2d 6) (1987)." *Jet Food Stores v. Kicklighter*, 226 Ga. App. 552, 553 (487 SE2d 120) (1997). Under this standard, there was no error in the trial court's denial of the defendant's motion for directed verdict and motion for j.n.o.v.

Both OCGA § 9-11-50 and § 9-11-56, which deal with motions for summary judgment, are similar and are governed by similar criteria, so that opinions as to one have application to the other. *Hawkins v. Greenberg*, 159 Ga. App. 302 (283 SE2d 301) (1981); *Southern Bell Tel. &c. Co. v. Beaver*, 120 Ga. App. 420 (170 SE2d 737) (1969); *Chandler v. Gately*, 119 Ga. App. 513 (167 SE2d 697) (1969); *Standard Accident Ins. Co. v. Ingalls Iron Works Co.*, 109 Ga. App. 574 (136 SE2d 505) (1964); *McCarty v. Nat. Life &c. Ins. Co.*, 107 Ga. App. 178 (129 SE2d 408) (1962). Therefore, the landmark decision of *Robinson v. Kroger Co.*, 268 Ga. 735 (493 SE2d 403) (1997) governing slip-and-fall cases on summary judgment controls in determining the same issues at or after trial, when the trial court makes an adjudication on the failure to prove an essential element of the cause of action in a slip-and-fall case.

1. (a) "The court stated [in *Alterman Foods v. Ligon*, 246 Ga. 620, 623 (272 SE2d 327) (1980)] that an invitee might recover for personal injury suffered in a slip and fall 'only when the perilous instrumen-

tality is known to the owner or occupant and not known to the person injured. . . .' . . . The court concluded that 'to state a cause of action[,] the plaintiff must show (1) that the defendant had actual or constructive knowledge of the foreign substance and (2) that the plaintiff was without knowledge of the substance or for some reason attributable to the defendant was prevented from discovering the foreign substance.' Id. at 623." *Robinson*, supra. "When the injured invitee attempted to explain that [she] fell due to a hazard of which [she] was not aware, the focus of the appellate analysis shifted from the plaintiff's voluntary exposure of [herself] to the hazard to another aspect of the plaintiff's negligence — the plaintiff's purported failure to employ all senses in a reasonable measure to discover and avoid that which might cause personal injury. Because either of the two prongs of *Alterman Foods* was sharp enough to impale a plaintiff's case, resolution of a defendant's knowledge of the hazard's existence was oftentimes pretermitted in favor of an inquiry as to whether the injuries plaintiff had fulfilled the invitee's duty to exercise ordinary care for personal safety. . . . By foregoing a resolution of the owner/occupier's knowledge of the hazard in favor of a holding based on the determination that an invitee who did not see a hazard should have seen it in the exercise of ordinary care for personal safety, the courts, in effect, ruled as a matter of law that the invitee had knowledge of the hazard equal to or greater than that of the owner/occupier without knowing the extent of the latter's knowledge, and implicitly held that an invitee's duty to exercise ordinary care in looking where one is going is paramount to an owner/occupier's duty to exercise reasonable care in inspecting and keeping the premises safe for invitees. . . . [T]hese decisions have placed in the limelight an invitee's duty to exercise reasonable care for personal safety and, in so doing, have relegated to the shadows the duty owed by an owner/occupier to an invitee." (Citation and punctuation omitted.) Id. Thus, if the plaintiff in her case-in-chief at trial has made out a prima facie case by satisfying the two prong test of *Alterman Foods* by proving knowledge on the part of the owner/occupier and the exercise of ordinary care for her own safety (or a legitimate reason why she did not discover the hazard), then the defendant has the burden of proof as to any affirmative tort defenses asserted by the defendant. The plaintiff, by making out a prima facie case in her case-in-chief, "place[s] on defendants [the burden of proof as to] that which is normally required of a defendant — the establishment of a defense to liability." Id.

Herein, it was shown in plaintiff's prima facie case that Kroger gave out samples of mousse after 5:00 p.m., within 75 feet of where the mousse ended up on the floor; that there was a trash can placed next to the bakery counter that showed Kroger's foreseeability as to

the need regarding trash from the samples; that samples were still available until 11:30 p.m. at the bakery counter; and that most customers had stopped coming into the store around 8:00 p.m. The last time that check-out lane five was swept and mopped was around 8:00 p.m., and, thereafter, there was only the night cashier on lane seven. At 8:00 p.m., when the customers dropped off, Mr. Hastings stopped making an hourly walk-through. The night cashier was *supposed* to check each check-out lane and to restock merchandise on each such lane when she was not waiting on customers; however, there was no evidence that the night cashier ever inspected check-out lane five or restocked it prior to the plaintiff's fall. The store manager did not know when check-out lane five had been last inspected or at what time he did his own walk-through inspections of the store prior to the fall; all that he could testify to was that he was sure that he had done one or several walk-throughs after 8:00 p.m., in the hours prior to the plaintiff's fall at 11:30 p.m.

Plaintiff's evidence showed that the paper cup of mousse had been flattened. A jury could infer from this that someone had previously stepped on the cup before the plaintiff stepped on it as well. In addition, the flattened cup and mousse were to the left side of the aisle from where plaintiff fell. The mousse was smeared over several feet of the floor around the flattened cup. The jury could find that this was consistent with someone, in addition to the plaintiff, stepping on the mashed cup in order for the mousse to be spread over such an extensive area. Further, the plaintiff had mousse on her pants as well as her shoe; there still was some mousse in the flattened cup, as well as mousse around it to plaintiff's left side, and there was a two-foot-long smear near the cup, although plaintiff fell to the right of the cup. Ms. Meineke, the friend, stated the opinion that the cup looked like someone had stepped on it and that the contents were spread around on the floor, but she could not state whether the cup was smashed by someone before the plaintiff's fall or by the plaintiff, herself. The jury could find that someone besides the plaintiff stepped on the cup before the plaintiff.

Mr. Hastings testified that he and the night cashier had been on check-out lane seven most of the time between 8:00 p.m. and 11:30 p.m. that evening, although they were supposed to inspect and see that the entire store was maintained.

"Constructive knowledge may be inferred where there is evidence that an employee of the owner was in the immediate vicinity of the dangerous condition and could easily have noticed and removed the hazard. [Cit.]" *Hughes v. Hosp. Auth. of Floyd County*, 165 Ga. App. 530, 531 (301 SE2d 695) (1983); accord *Blake v. Kroger Co.*, 224 Ga. App. 140, 142 (1) (480 SE2d 199) (1996); *Thompson v. Regency Mall Assoc.*, 209 Ga. App. 1, 3 (432 SE2d 230) (1993); *Food Giant v.*

*Cooke*, 186 Ga. App. 253, 254 (1) (366 SE2d 781) (1988); see also *Winn-Dixie Stores v. Hardy*, 138 Ga. App. 342, 345 (4) (226 SE2d 142) (1976), which case first set forth this standard. *Winn-Dixie Stores v. Hardy*, supra, based its constructive knowledge standard upon *S. H. Kress & Co. v. Flanigan*, 103 Ga. App. 301, 303 (119 SE2d 32) (1961), where the employee was six feet away, and *Sharpton v. Great A &·P Tea Co.*, 112 Ga. App. 283 (145 SE2d 101) (1965), where the employee was several check-out aisles away, restocking merchandise on a different check-out aisle. Thus, whether an employee was in the "immediate vicinity" is a factual question for the jury's determination, i.e., whether or not "the defendant had an opportunity to discover the defect [because] one of defendant's employees was in a position to see the defect . . . by casual observation." *Sharpton v. Great A & P Tea Co.*, supra at 285. The jury could find that when the night cashier or the manager left check-out lane seven and went towards check-out lane five, the hazard was observable to them, so that they were in a position to discover the hazard.

In this case, the night cashier and the manager were two check-out lanes away, lane seven, from check-out lane five, where plaintiff fell. They had been at lane seven from 8:00 p.m. to 11:30 p.m. and were supposed to inspect the area where the fall took place, either while restocking or while doing a walk-through inspection. Another employee saw plaintiff fall and went to her assistance within moments after her fall. It was a jury issue whether these employees could be considered in the "immediate vicinity" and whether they were in a position to see the mousse on the floor from where they were at various times between 8:00 p.m. and 11:30 p.m. when they were away from lane seven. "The existence of such [constructive] knowledge is a matter for the jury when there is evidence from which it may be inferred. [Cit.]" *Gold & White, Inc. v. Long*, 159 Ga. App. 259, 260 (283 SE2d 45) (1981); *Piggly-Wiggly Southern v. Tucker*, 139 Ga. App. 873 (1) (229 SE2d 804) (1976). Therefore, the directed verdict and j.n.o.v. were properly denied.

(b) "Liability based on constructive knowledge may also be established by showing that the owner failed to exercise reasonable care in inspecting the premises, but recovery under that approach requires proof of the length of time the dangerous condition was allowed to exist. [Cits.]" *Hughes v. Hosp. Auth. of Floyd County*, supra at 531. "To sustain plaintiff's cause of action in the [failure to inspect] case it is necessary that [she] prove a period of time the dangerous condition has been allowed to exist. Without such proof[,] it would not be possible to determine whether the defendant had been afforded a reasonable time within which to inspect and remove the hazard. *Banks v. Colonial Stores*, 117 Ga. App. 581 (161 SE2d 366) [(1968)]. *Winn-Dixie Stores, Inc. v. Hardy*, [supra at 345]." (Punctuation omitted.)

*Piggly-Wiggly Southern v. Tucker*, supra at 875. Where there was a conflict in evidence between five minutes and several hours, this created a jury issue. Id. A specific amount of time must be "alleged or proved that the foreign substance was permitted to remain on the floor" to create a duty on the owner/occupier to discover and remove it. *Winn-Dixie Stores v. Hardy*, supra at 345. "The length of time which must exist to show that the defendant had an opportunity to discover the defect will vary with the circumstances of each case[, i.e.,] the nature of the business, size of the store, the number of customers, the nature of the dangerous condition and the store's location." (Citation and punctuation omitted.) *Alterman Foods*, supra at 623; accord *Food Giant v. Cooke*, supra at 256. Further, "[a] correct rule is that in the absence of evidence[,] . . . a reasonable inspection would have discovered the foreign substance, no inference can arise that defendant's failure to discover the substance was the result of its failure to inspect." *Blake v. Kroger Co.*, supra at 144. Conversely, where the evidence raises the inference that the foreign substance was discoverable pursuant to a reasonable inspection, a jury issue arises as to whether the defendant had constructive knowledge of what reasonable inspection would have revealed and a directed verdict is not appropriate.

In this case, the evidence was that the last known scheduled sweeping, mopping, and inspection of check-out lane five occurred at 8:00 p.m., following routine inspection procedures, and that the area would be swept and mopped only on an as-needed basis after that time, which did not occur prior to the fall. Both the manager, who was bagging groceries on the only open check-out lane, lane seven, and the night cashier had the responsibility of inspecting check-out lane five after 8:00 p.m., when there were no customers checking out. In the incident report filled out immediately after the fall, the store manager did not know the last time check-out lane five had been inspected, mopped, or cleaned up. Mr. Hastings testified that he could not remember specifically what time he did the last walk-through inspection of the store, but he was sure that he had done at least one, and possibly two, inspections during the hours prior to plaintiff's fall. The mousse samples had been out since 5:00 p.m., but the number of customers dropped off around 8:00 p.m. so that only one night cashier was needed and the lights could be dimmed. This factual scenario raises an inference that the jury could draw that the mousse had been dropped earlier in the evening, when there had been more customers sampling the mousse.

Further, the paper cup was flattened and mousse was spread all over the left side of check-out lane five, as if someone had stepped on it prior to the plaintiff stepping on it; the jury could find that the area over which the mousse was spread would require more than the

plaintiff stepping on it to smear it over such area. The jury could infer that the mousse had been on the floor anywhere from 8:00 p.m. to 10:30 p.m. and that the mousse had been on the floor long enough for someone else to step in it and to track it around. Thus, there existed a jury issue as to the length of time that the mousse had been on the floor and whether the defendant had exercised ordinary care in its inspection of the premises during such time period. See *Jet Food Stores v. Kicklighter*, supra; *Newell v. Great A & P Tea Co.*, 222 Ga. App. 884, 887 (1) (476 SE2d 631) (1996). Accordingly, a directed verdict or j.n.o.v. could not be granted on this basis.

2. "By encouraging others to enter the premises to further the owner/occupier's purpose, the owner/occupier makes an implied representation that reasonable care has been exercised to make the place safe for those who come for that purpose, and that representation is the basis of the liability of the owner/occupier for an invitee's injuries sustained in a 'slip-and-fall.' Prosser, Law of Torts (4th ed.), p. 422, § 61; *Begin v. Ga. Championship Wrestling*, [172 Ga. App. 293, 294 (322 SE2d 737) (1984)]. An invitee who responds to the owner/occupier's invitation and enters the premises does so pursuant to an implied representation or assurance that the premises have been made ready and safe for the invitee's reception, and the entering invitee is entitled to expect that the owner/occupier has exercised and will continue to exercise reasonable care to make the premises safe. Id. It is in this light that an invitee's exercise of ordinary care for personal safety must be examined." *Robinson*, supra. "The invitee is not bound to avoid hazards not usually present on the premises and which the invitee, exercising ordinary care, did not observe . . . , and the invitee is not required, in all circumstances, to look continuously at the floor, without intermission, for defects in the floor. An invitee is not obliged to inspect the premises to discover latent defects nor even to observe patent defects. [L]ooking continuously in all directions is not required in all circumstances to exercise ordinary care for personal safety." (Citations and punctuation omitted.) Id.

Plaintiff met the second prong of *Alterman Foods* by making out a prima facie case of her exercise of ordinary care for her own safety by showing that the color of the mousse and floor tiles camouflaged its presence, which was known or should have been known by Kroger; that her friend's body, an arm's length ahead of her, obstructed her view; and that she had been looking where she was going without talking or looking at displays. Also, the manager had dimmed the lights to save energy, which added to the obscuring of the mousse on the floor.

*Judgment affirmed. McMurray, P. J., and Blackburn, J., concur.*

DECIDED MARCH 26, 1998

*Webb, Carlock, Copeland, Semler & Stair, Douglas A. Wilde, James R. Doyle II*, for appellant.

Ashley Brooks, *pro se*.

*The Ford Law Firm, James L. Ford, Sr., Christopher G. Moorman*, for appellee.